801 P.2d 98

STATE of New Mexico, Plaintiff–Appellee,

v.

Michael A. BOLTON and Norman E. Gill, Defendants–Appellants.

No. 11194.

Court of Appeals of New Mexico.

Sept. 20, 1990.

Certiorari Denied Nov. 14, 1990.

30

Nancy Hollander, John W. Boyd, Freedman, Boyd & Daniels, P.A., Albuquerque, for defendant-appellant Michael A. Bolton.

Michael V. Davis, Franchini, Wagner, Oliver, Franchini & Curtis, Albuquerque, for defendant-appellant Norman E. Gill.

Hal Stratton, Atty. Gen., Gail MacQuesten, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HARTZ, Judge.

On defendants' motion for rehearing, we deny the motion but withdraw our opinion filed on May 17, 1990, and substitute the following.

Each defendant appeals his conviction of trafficking a controlled substance. The sole issue on appeal is the legality of the search that uncovered cocaine in a false gas tank on their truck. We affirm.

To put defendants' contentions in context, we first outline the circumstances of the search, although we will need to develop the facts further in the discussion of the specific contentions. The evidence concerning the search was elicited at a pretrial hearing on defendants' motion to suppress. We view that evidence in the light most favorable to sustain the district court's finding that the search was lawful. *See State v. Bloom,* 90 N.M. 192, 194, 561 P.2d 465, 467 (1977); *State v. Boeglin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App. 1983).

Defendants were traveling east on Interstate 40 in a 1986 heavy-duty Chevrolet pickup truck when they were stopped at a state police roadblock near Santa Rosa. At the roadblock state police officers subjected virtually all noncommercial vehicles to a "primary" inspection for valid driver's licenses, vehicle registrations, and proofs of insurance. United States Border Patrol Agents observed, and sometimes participated in, the operations at the roadblock. Defendant Gill, the driver, produced a valid driver's license and vehicle registration. He stated that the vehicle belonged to Deborah Degree; but the name on the registration was "Kimberly Degree." State Police Officer Newman directed Gill to pull to the side of the road for a more thorough "secondary" inspection.

The secondary inspection, which included a computer check to confirm registration and to determine if there were any "wants

or warrants" on the truck or its occupants, revealed no problems. After learning this, Newman, as apparently was his custom with respect to all vehicles subjected to a secondary inspection, requested permission to search the vehicle. Meanwhile, Border Patrol Agent Burton had independently made observations of the truck, which aroused his suspicions concerning the gas tank on the back of the vehicle. While Newman was talking with defendants, Burton kneeled down to check the truck's undercarriage and saw no fuel lines running to the rear gas tank. After Newman obtained defendants' ostensible consent for a search, Burton briefly questioned defendants about the rear gas tank. Neither defendant knew how to fill it. Burton later crawled under the truck to confirm his prior observations that no fuel lines were connected to the gas tank and also rapped on the exterior of the tank to determine if its contents were liquid or solid. Based on the observations of Burton, the officers searched the contents of the gas tank and found cocaine.

Defendants challenge the validity of (1) the roadblock, (2) their detention after completion of the computer check, (3) their consent, (4) the examination of the underside of the truck, and (5) the search of the rear gas tank. We hold that the roadblock, the detention after the computer check, and the inspection of the underside of the truck were lawful. We also hold that the officers had probable cause to search the interior of the gas tank. We briefly address the consent, although we find it unnecessary to determine whether it encompassed the search of the gas tank.

## 1. THE ROADBLOCK

■ Police detention of a motor vehicle traveling on the highway constitutes a seizure, subject to the restrictions of the fourth amendment to the Constitution, applicable to the states through the fourteenth amendment. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Ordinarily such a detention is forbidden unless the officers detaining the vehicle have probable cause, or at least reasonable suspicion, to believe that the vehicle or its occupants are subject to seizure under applicable criminal laws. *See id.* Nevertheless, roadblocks operated for certain purposes pass constitutional muster if they are conducted in a constitutionally reasonable manner. *See City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (Ct.App.1987) (sobriety roadblock).

■ The reasonableness of a roadblock provides a constitutionally adequate substitute for the reasonable suspicion that would otherwise be required to justify the detention of vehicles and the questioning of their occupants. *See id.* In *Betancourt* we presented eight guidelines to be considered in determining the reasonableness of a roadblock: (1) supervisory personnel should select the site and establish procedures for conducting the roadblock; (2) the discretion of field officers should be restricted so that motorists are treated as uniformly as possible; (3) the roadblock should be conducted safely; (4) the location should be reasonable; (5) the time of day and duration of the roadblock should be reasonable; (6) the official nature of the roadblock should be immediately apparent; (7) the length and nature of the detention caused by the roadblock should be minimized; and (8) the roadblock should receive advance publicity. *Id.* at 658–59, 735 P.2d at 1164–65. The guidelines were not intended to be exclusive; other factors could be considered where appropriate. *Id.* at 658, 735 P.2d at 1164.

Defendants do not challenge the legitimacy of roadblocks to check driver's licenses, vehicle registrations, and liability insurance. Their objections concern the specifics of this roadblock. They complain that (1) the ostensible purpose of the roadblock was a pretext, the actual purposes being to conduct an unlawful Border Patrol checkpoint for aliens and to search for drugs; and (2) the roadblock did not comply with *Betancourt* in that (a) the detention was not minimized, because Officer Newman sought consent to search every vehicle subjected to secondary inspection, and (b) the roadblock was used to stop a particular group—suspected aliens.

## A. Pretext

■ Defendants' first attack on the roadblock raises an issue not specifically addressed in *Betancourt.* They complain that the ostensible purpose of the roadblock—checking license, title, and insurance documents—was not its actual purpose. They contend that the actual purpose was the improper purpose of enforcing laws governing aliens and narcotics.

We have previously held that to overcome a claim that a search or seizure was pretextual, the state need prove only a valid legal basis for the intrusion. *State v. Mann,* 103 N.M. 660, 712 P.2d 6 (Ct.App. 1985); *see United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989); *State v. Valdez Olaiz,* 100 Or.App. 380, 786 P.2d 734 (1990). By that standard the roadblock passes muster, because we have upheld a roadblock to check license, title, and insurance documents. *See State v. Valencia Olaya,* 105 N.M. 690, 736 P.2d 495 (Ct.App.1987).

Defendants, however, ask us to adopt the pretext doctrine expressed in *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988) and similar federal decisions, which imposes a stricter standard. In *Guzman,* a New Mexico State Police Officer stopped the defendant's car, ostensibly because the defendant was not wearing a seat belt. Evidence acquired during the stop led to the defendant's arrest for possession of cocaine. The trial judge suppressed the evidence, finding that the officer's actual purpose in stopping the defendant was to investigate criminal drug activity, despite lacking reasonable suspicion of such misconduct. The Tenth Circuit rejected the lower court's subjective test for determining whether the stop was unlawful, and remanded for application of an objective test: " 'whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.'" *Id.* at 1515 (quoting *United States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986) (emphasis in original)).

*Guzman* explained the test as the consequence of two concerns. On the one hand, it viewed inquiry into the subjective intent of a law enforcement officer as an unwise and unproductive means of determining whether a person's fourth amendment rights have been violated. On the other hand, fourth amendment interests are threatened when law enforcement officers have, in practice, unbridled discretion to detain persons for reasons which, standing alone, could not justify the detention.

> [G]iven the pervasiveness of * * * minor [traffic] offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone, [the requirement of a traffic violation] hardly matters, for * * * there exists "a power that places the liberty of every man in the hands of every petty officer," precisely the kind of arbitrary authority which gave rise to the Fourth Amendment.

1 W. LaFave, *Search and Seizure,* § 1.4(e), at 95 (2d ed. 1987) (quoting 2 L. Wroth & H. Zobel, *Legal Papers of John Adams* 141–42 (1965)).

*Guzman's* concern with the unbridled discretion of the officer in the field has been shared by the United States Supreme Court. This concern has been at the heart of Supreme Court rulings affirming sobriety and immigration checkpoints while prohibiting roving patrols for the same purpose. *Compare Michigan Dep't of State Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (sobriety checkpoint) *and United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (immigration checkpoint) *with Delaware v. Prouse* (roving patrol for intoxicated drivers) *and Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (immigration roving patrol).

The need for uniform procedures to circumscribe the discretion of officers in the field is not, however, the issue raised by defendants' pretext argument in this case. The claimed abuse is that of higher ranking officials. Those officials allegedly set up a roadblock purportedly to check for violations of certain laws governing motorists, when the true purpose of the roadblock was to detect violators of drug and immigration laws. This pretext argument is not

dependent on any absence of uniformity in the way field officers treated individual motorists.

The concern underlying defendants' argument is a legitimate one. We recognize a potential for abuse of the authority to conduct roadblocks. We assume, without deciding, that there are only a limited number of purposes for which a roadblock may be established. Our decisions have upheld roadblocks to check the sobriety of drivers, *see City of Las Cruces v. Betancourt*, and roadblocks to determine if drivers are properly licensed and their vehicles properly registered and insured. *See State v. Valencia Olaya.* What if law enforcement officers thought that a roadblock would be useful for a purpose that would not itself constitute adequate legal grounds for a roadblock? They might be able to set up a sobriety or document-check roadblock satisfying the *Betancourt* guidelines, even though they had little interest in the ostensible purpose of the roadblock. The threat to fourth amendment interests would be that motorists would be subjected to excessive intrusions at roadblocks—excessive detentions not founded on reasonable suspicion or probable cause.

That threat, however, does not derive from placing excessive discretion in the hands of field officers. The underlying rationale of *Guzman* is therefore inapplicable. Moreover, the *Guzman* approach in this context adds nothing to current New Mexico law. The *Guzman* test for roadblocks would be: "Under the same circumstances would a reasonable police department have conducted the roadblock in the absence of the invalid purpose?" This test is essentially subsumed under the *Betancourt* guidelines. In particular, those guidelines include the reasonableness of the time, place, and duration of the roadblock, which bear on the effectiveness of the roadblock to serve its proper purpose. *See City of Las Cruces v. Betancourt*, 105 N.M. at 657, 735 P.2d at 1163. Thus, we will not add the *Guzman* test to the *Betancourt* guidelines.

In any event, despite defendants' invocation of *Guzman*, the substance of their

argument in the district court and here has not been that no reasonable police agency would have set up the roadblock at the time and place of the one conducted here. Rather, their thrust has been that the evidence establishes that the actual purpose of the state police in this case was not to check motorists for driver's licenses, registration, and proof of insurance. Contrary to the *Guzman* approach (in which the subjective state of mind of the police is deemed irrelevant), they have focused on what they contend was the *actual purpose* of the state police.

We do not reject that approach. Some authority suggests that the actual purpose of the police agency may be constitutionally relevant when an intrusion not justified by probable cause or reasonable suspicion can be upheld as an administrative inspection. For example, in *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Supreme Court upheld an inventory search. The search was conducted in accordance with departmental guidelines that adequately constrained the discretion of the field officer. The Court noted that inventory searches satisfy a legitimate police objective which is independent of any investigatory purpose. The Court wrote, "In the present case * * * there was no showing that the police, who were following standardized procedures, acted in bad faith or for the *sole* purpose of investigation." *Id.* at 372, 107 S.Ct. at 741 (emphasis added). In *Michigan v. Clifford*, 464 U.S. 287, 291–95, 104 S.Ct. 641, 645–47, 78 L.Ed.2d 477 (1984), the prevailing plurality of the Supreme Court stated that the constitutionality of a search at the scene of a fire may depend upon whether the primary purpose of the search is to determine the fire's origin or to find evidence of crime. In *United States v. McFayden*, 865 F.2d 1306 (D.C.Cir.1989), the court upheld a roadblock on the ground that its "principal purpose" was a valid one, even though the roadblock advanced purposes other than the purpose that provided legitimacy to the roadblock.

Therefore we review defendants' contentions and the relevant evidence concerning the subjective intent behind the roadblock.

Without deciding whether to adopt a sole-bad-purpose test or a primary-bad-purpose test—or even whether to adopt a subjective test at all—we find that the district court was entitled to find, based on the evidence before it, that the purpose of the roadblock in this case was legitimate.

Defendants' principal claim of pretext is that the state police were actually conducting the roadblock for the purpose of assisting the Border Patrol in investigating immigration offenses. Encompassed within this claim is the contention that the checkpoint was in fact a Border Patrol checkpoint, which the Border Patrol itself could not lawfully operate. We address this point first.

According to testimony at the hearing, the Border Patrol had received reports that aliens unlawfully in the United States were disembarking from trains near Santa Rosa and traveling along Interstate 40. The Border Patrol apparently wished to obtain further "intelligence" concerning this activity to determine the wisdom of establishing a border control station in the area. *Cf.* 8 U.S.C. § 1357(a)(3) (1982) (Border Patrol agents may board and search railway cars and other vehicles "within a reasonable distance from any external boundary of the United States"); 8 C.F.R. § 287.1(a)(2)(b) (1989) ("reasonable distance" means within one hundred air miles from an external boundary, except that it includes a larger distance when unusual circumstances establish that the larger distance is reasonable). The Border Patrol requested permission from the state police to have agents present at a state police roadblock to attempt to gather pertinent information. The state does not dispute that the Border Patrol lacked lawful authority to conduct a checkpoint at the time and place defendants were apprehended.

■ The roadblock was not, however, operated as a Border Patrol checkpoint for immigration offenses. The state's witnesses testified that only state police officers, not Border Patrol agents, conducted the initial stop and questioning of motorists. The state police officers asserted that the purpose of the roadblock was to check driv-er's licenses, vehicle registrations, and proofs of insurance. There was no evidence that state police officers questioned motorists about their citizenship in the absence of reasonable suspicion, except insofar as obtaining evidence of citizenship would be inseparable from their other duties (a driver's license reveals one's residence). The state's witnesses also testified that Border Patrol agents became involved in questioning motorists concerning citizenship only after state police officers informed the agents that they had reasonable suspicion that an individual was unlawfully in the country. In short, no one was investigated for immigration law violations in the absence of reasonable grounds to do so. Nor does the Constitution forbid other law enforcement officers from observing, or even assisting, the operation of an otherwise legitimate roadblock. *See United States v. McFayden* (personnel from Operation Cleansweep—an anti-drug operation—involved in roadblock for traffic purposes). Defendants neither cite any authority for, nor even argue, the proposition that Border Patrol agents cannot try to obtain useful intelligence information regarding immigration violations by watching a state police roadblock. Thus, the checkpoint was not in actuality an immigration checkpoint, nor did the Border Patrol agents exceed their lawful authority.

■ The above conclusion concerning the operation of the roadblock does not, however, answer defendants' contentions regarding the purpose of the roadblock. Although Border Patrol agents may observe roadblocks set up for valid state police purposes, it does not follow that the state police may set up roadblocks for the purpose of helping the Border Patrol obtain intelligence information. If the record showed that Border Patrol agents invariably, or even regularly, were present in force at state police roadblocks, one might be compelled to infer that the purpose of the roadblocks was to enforce immigration laws, not to detect violations of the licensing, registration, and insurance laws. Such roadblocks seemingly would not have been conducted in the absence of a purpose—in-

vestigating immigration-law violations—that could not justify roadblocks at that location.

That was not the situation here. The district court found that the roadblock was for the proper purpose. Testimony at the hearing supported that inference. Two state police officers testified that the purpose was to check licenses, registrations, and insurance. Sergeant Acosta, supervisor of the State Police Santa Rosa Subdistrict, testified that his subdistrict conducted roadblocks "quite frequently." *See, e.g., United States v. Lopez*, 777 F.2d 543 (10th Cir.1985) (New Mexico State Police roadblock on Interstate 40 near Santa Rosa). Thus, one could infer that the roadblock was simply one of many regularly conducted on the same stretch of interstate highway.

■ To be sure, the apparently uncontradicted testimony was that the timing of this particular roadblock was chosen to accommodate the schedules of Border Patrol agents. Yet, given the state police subdistrict's practice of conducting such roadblocks, the district court could reasonably conclude that the purpose of this roadblock was the same as the purpose of those at which no Border Patrol agents were present. We see nothing improper in selecting the date for one, isolated roadblock (that would have been conducted in any event) so as to accommodate the Border Patrol's schedule. Nothing in the record suggests that the date was selected to increase the likelihood of stopping a particular person, or even a particular class of persons. Choosing one date over another as the time for instituting a checkpoint in order to serve the convenience of another agency that wishes to observe the operation does not necessarily prove that the roadblock was a subterfuge.

■ The involvement of the Border Patrol is evidence concerning the purpose of the state police in establishing the roadblock, but it is not determinative of whether the sole, or even the chief, purpose of setting up the roadblock was an illegitimate one. *See United States v. McFayden;* 1 W. LaFave, *supra,* § 1.4(e), at 92

("[I]f the police arrest $X$ for crime $A$, as they would have in any event, in the anticipation or hope of thereby finding evidence of crime $B$ on $X$'s person, the latter 'underlying intent or motivation' does not make their action illegal."). We see no constitutionally protected interest that is advanced by requiring the law enforcement agency to conduct a roadblock on Thursday rather than Tuesday. If we prohibit the state police from adjusting its schedule to suit the convenience of the Border Patrol, the result would simply be that the Border Patrol would have to change its schedule to suit the convenience of the state police. (Of course, as already noted, repeated participation by the Border Patrol in state police document-check roadblocks would be strong evidence that the ostensible purpose of the roadblock was a pretext.) Although the presence at the roadblock of Border Patrol agents could "facilitate the detection of crimes unrelated to licensing," 4 W. La-Fave, *supra,* Section 10.8(b), at 64, it does not necessarily follow that the roadblock was a subterfuge. The involvement of the Border Patrol was evidence for the district court to consider, but it did not require the district court to rule in defendants' favor on the pretext issue.

■ Defendants also contend that the actual purpose of the roadblock was to search for drugs. Defendants claim that two items of evidence support this conclusion. First, they note that after their truck was moved to secondary inspection, Officer Newman asked defendant Bolton, the passenger, for his driver's license. The officer testified that his reason was "to see if he owned the car." Defendants claim, however, that the officer could see from the registration that the truck belonged to a woman, and if the officer really wished to know if Bolton owned the truck, the officer could simply have asked Bolton. The leap from those observations to the conclusion that the purpose of the checkpoint was to search for drugs is an imaginative one, to say the least. In any case, the argument is based on a false factual premise. The registration contained two names. The officer wanted the passenger's driver's license to

see if he was the other person named on the registration. We see nothing improper in the officer's requesting a document rather than asking the passenger his name.

The second item of evidence allegedly supporting the inference that the roadblock was established as a pretext to search for drugs is that Officer Newman requested permission to search all vehicles moved to secondary inspection. Although defendants do not explain how such a routine implies an improper purpose, we assume that defendants contend that the motivation for the entire roadblock was the opportunity it provided to obtain consent searches during secondary inspection—searches that could uncover narcotics. The contention is not frivolous, but neither is it so forceful that we must reject the district court's finding regarding the roadblock's purpose. We cannot say as a matter of law that Officer Newman's practice establishes that the purpose of the roadblock was improper.

The district court was entitled to credit the officers' testimony concerning their motives. The state police's prior practice of conducting record-check roadblocks on the same stretch of highway—without the presence of Border Patrol agents—corroborates that testimony. Although another district court may have found to the contrary, substantial evidence in the record at the suppression hearing supports the district court's Finding No. 3 that the roadblock was "to check driver's licenses, vehicle registrations and proofs of insurance." The district court could properly reject defendants' requested conclusions of law: "5. The roadblock was invalid because it was set up for purposes beyond checking drivers [sic] licenses, vehicle registrations, proof of insurance and/or intoxication"; "6. The roadblock in this case was invalid because it was set up as a pretext to search for aliens"; and "7. The roadblock was additionally invalid because it was set up as a pretext to search for weapons and contraband."

**B. Minimization**

Defendants next complain that the roadblock did not meet *Betancourt*'s requirement that, "The average length of time that a motorist is detained at the roadblock and the degree of intrusiveness should be minimized." *Id.* 105 N.M. at 659, 735 P.2d at 1165. Defendants contend that the roadblock did not meet this minimization requirement because Officer Newman requested consent to search every vehicle subjected to secondary inspection. (The record does not indicate the practice of other officers manning the roadblock.)

Officer Newman, however, requested consent only after the vehicle had been removed to secondary. Such removal requires reasonable suspicion or probable cause. *See United States v. McFayden,* 865 F.2d at 1312. *Cf. Michigan Dep't of State Police v. Sitz,* — U.S. at —, 110 S.Ct. at 2485, 110 L.Ed.2d at 420 (upholding sobriety checkpoint with respect to initial stop of motorist but noting, "Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard."). To determine what police behavior is proper during secondary inspection, we should look to general principles governing police officers after they have acquired reasonable suspicion or probable cause. *See Ingersoll v. Palmer,* 43 Cal.3d 1321, 1346, 743 P.2d 1299, 1316, 241 Cal.Rptr. 42, 60 (1987). The concern of *Betancourt* was the primary inspection at roadblocks. The *Betancourt* requirements are to assure that the primary inspection is constitutionally reasonable despite the absence of reasonable suspicion or probable cause to detain the vehicle and its passengers.

*Betancourt* did not address police conduct during secondary inspection except to say, during its discussion of minimization of the detention and intrusion, "Where facts within the observation of the officer warrant further investigation, the suspected motorist should be asked to pull into a separate testing area so as not to unreasonably inhibit the flow of traffic." *Id.* 105 N.M. at 659, 735 P.2d at 1165. Thus, the sole specific reference to secondary inspection was a mandate that such inspections should not interfere with the conduct of

primary inspection. We add, however, that the conduct of secondary inspection may also be relevant to the validity of the primary inspection insofar as it provides evidence of a pretextual reason for the roadblock. (We note that the analysis will be altered somewhat if the roles of primary and secondary inspections are different from what they were in this case. For example, at Border Patrol checkpoints heavy traffic may limit the primary inspection to only a momentary visual check; vehicles are diverted to secondary on less than individualized reasonable suspicion, but the secondary inspection is essentially equivalent to the primary inspection in this case.)

■ We intimate no view on the constitutional reasonableness of requesting consent to search vehicles stopped at a roadblock solely for primary inspection. Also, we emphasize that absent a constitutionally reasonable roadblock or reasonable suspicion, an officer has no right to stop a vehicle to request consent to search the vehicle. *See Delaware v. Prouse.*

C. Focusing on Aliens

■ Defendants also contend that the roadblock was used to stop a particular group—suspected aliens—in violation of the rule in *Betancourt* that "a location chosen with the actual intent of stopping and searching only a particular group of people, i.e., hispanics, blacks, etc., would not be tolerated." *Id.* at 659, 735 P.2d at 1165. That rule has no application here. The roadblock was on an interstate highway. All traffic was stopped, at least so long as no dangerous backup of vehicles occurred. No evidence suggests that the location of the roadblock was selected for the purpose of stopping "only a particular group of people."

2. LAWFULNESS OF THE OTHER LAW-ENFORCEMENT ACTIONS

Having determined that the primary detention at the roadblock was lawful, we next consider the lawfulness of the subsequent conduct of law enforcement officers in this case. In their brief-in-chief defendants do not raise any legal challenge specifically directed at Officer Newman's decision to subject them to a secondary inspection. *See United States v. Lopez.* Nor do they challenge their detention while Officer Newman made his computer check, except to contend that Officer Newman could not lawfully examine the driver's license of passenger Bolton, a contention we have already rejected.

To address defendants' other contentions properly, we first describe in detail the observations and activities of Border Patrol Agent Burton. Burton first observed defendants' truck as he was getting out of his car upon arriving at the roadblock. The truck was undergoing secondary inspection. The first thing he noticed about the truck was a shiny gas tank hanging underneath the truck, immediately in front of the license plate, where the spare tire would ordinarily be placed on that vehicle, a dangerous location to store fuel. Because of his experience with several other smuggling operations in which a false gas tank had been used to conceal contraband, he immediately became suspicious. He approached the truck and looked through a window of the camper shell for any evidence that the tank had a legitimate use, such as filler spouts that one could use to put gasoline into the tank. He saw no such items, but did see a jack and a plank of wood. He then kneeled on one knee to look at the underside of the truck. The truck was raised well off the ground. (In fact, he had been able to see the truck's underside from his vehicle, which had been parked off the side of the road down an embankment. He testified, "You could see the whole underside of the truck from where I had been standing off to the side as I approached.") He saw no lines going to the gas tank. Also, the marks on the plank of wood matched the marks that would be left from the strapping used to hold the gas tank in place. The strapping was rough cut, the edges were not milled, and the bolt holes were off center. Apparently, the jack and plank had been used to install or remove the gas tank.

After making those observations, Burton approached Newman, who was talking with defendants. He heard Newman ask for permission to search the truck. When Newman stepped back to permit defendants to exit the truck, Burton asked them how many gas tanks they had. Bolton replied "three" and Gill replied "two." Burton then asked how they filled the back gas tank. They told him that they did not know and became nervous. Burton then described the gas tank and his suspicions to Newman. After another officer arrived to watch defendants, Burton and Newman walked to the rear of the truck, where Burton pointed out that the gas tank could not be used for gasoline, that the strapping seemed hand-cut, that the tank did not fit in, and that the tank was not intended for that area of the truck. Burton then crawled under the truck to double check that every fuel line from the front of the truck went to the two saddle tanks in front of the wheel wells and that there was no connection between the fuel tank in back and either the engine or the two saddle tanks. He also rapped on the back tank, noting that throughout the tank were hollow spaces next to spaces producing a muffled sound, suggesting that the contents were solid rather than liquid. When the officers were unable to find a magistrate, they removed and searched the tank, finding cocaine.

Defendants challenge the search on five grounds: (1) Burton, as a Border Patrol agent, could not lawfully conduct an investigation for offenses unrelated to the immigration laws. (2) Burton's observations of the underside of the truck constituted a search, and the search, being without probable cause, was unlawful. (3) The detention of the truck and defendants after the computer check proved negative was unlawful, so no observation made during that portion of the detention could be used to support probable cause. (4) The evidence acquired by Burton did not suffice to establish probable cause. (5) Defendants did not give lawful consent to search. We hold that Burton acquired sufficient evidence to establish probable cause to search the tank and that he acquired that evidence lawful-

ly. We need not consider whether the search of the tank could be justified as consensual.

A. Legality of Investigation by Border Patrol Agents of Offenses Other than Those Related to Immigration

█ The Border Patrol agents could lawfully observe the activities at the roadblock. Their primary purpose, obtaining intelligence information about the presence of aliens and alien smugglers in the area, was undoubtedly a valid one for Border Patrol agents.

While engaged in legitimate investigative work, the Border Patrol agents did not need to close their eyes to criminal activity unrelated to their principal concern. *See United States v. Walraven*, 892 F.2d 972 (10th Cir.1989); *United States v. McFayden*, 865 F.2d at 1312; *United States v. Lanford*, 838 F.2d 1351 (5th Cir.1988); *United States v. Diaz–Albertini*, 772 F.2d 654, 658 (10th Cir.1985), *cert. denied*, 484 U.S. 822, 108 S.Ct. 82, 98 L.Ed.2d 45 (1987); *United States v. Prichard*, 645 F.2d 854, 856–57 (10th Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981). *United States v. Soto–Soto*, 598 F.2d 545 (9th Cir.1979), relied upon by defendants, is distinguishable. In *Soto–Soto* an FBI agent conducted a search of a vehicle to determine if it was stolen. The search occurred near the border between the United States and Mexico. The prosecution argued that the search was lawful as a border search. The statute authorizing border searches, however, restricts the authority to conduct such searches to only certain federal agents. FBI agents had not been included among those with that authority. Also, the search was not conducted to enforce customs laws, the authorized purpose for border searches. The search being contrary to federal statutory law, the court suppressed the fruit of that search.

Defendants, on the other hand, have cited no statutory provision or case law either (1) prohibiting Border Patrol agents from making observations about general criminal conduct or assisting other law-enforcement agencies in investigating and appre-

hending offenders or (2) limiting such law-enforcement activity to only certain federal agencies (not including the Border Patrol). On the contrary, we take judicial notice of the myriad prosecutions for non-immigration offenses in which Border Patrol agents made the initial observations leading to the apprehension of the suspects. Moreover, Burton, the Border Patrol Agent whose conduct is at issue, testified that he was cross-designated by the Drug Enforcement Administration and the Customs Service, giving him specific authority in the investigation of drugs and smuggled contraband.

### B. Plain View/Open View Doctrine

■ Agent Burton's observations of the exterior of defendants' truck and his observations of the interior of the camper (made through a window of the camper) were lawful. Under the "plain view" doctrine these observations did not constitute searches.

In *State v. Powell*, 99 N.M. 381, 658 P.2d 456 (Ct.App.1983) we noted that the "plain view" rule has two meanings. We quote from the explanation provided in that opinion:

> The first, and more common meaning, is discussed in *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), in terms of an intrusion justified by a warrant, a "hot pursuit" or search incident to an arrest. In these, and similar situations, there was "a prior justification for an intrusion in the course of which * * * [the police officer] came inadvertently across a piece of evidence incriminating the accused" and the incriminating nature of this evidence was immediately apparent. This meaning of plain view was summarized in *State v. Luna*, 93 N.M. 773, 606 P.2d 183 (1980). This first meaning of plain view is not applicable in this case because of the facts.
>
> The second meaning, applicable in this case, is stated in 1 W. LaFave, Search

and Seizure § 2.2, pages [322–23 (2d ed. 1987) ]:

> [T]he concern here is with plain view in a quite different sense, namely, as descriptive of a situation in which there has been no search at all in the Fourth Amendment sense. This situation, which perhaps is deserving of a different label so as to avoid confusion of it with that discussed in *Coolidge,* encompasses those circumstances in which an observation is made by a police officer without a prior physical intrusion into a constitutionally protected area. This includes the case in which an officer discovers an object which has been left in an "open field" *or similar nonprotected area,* and also those cases in which an officer—again, without making a prior physical intrusion—sees an object on the person of an individual, within premises, or within a vehicle. In each of these instances there has been no search at all because of the plain view character of the situation, and this means that the observation is lawful without the necessity of establishing either pre-existing probable cause or the existence of a search warrant or one of the traditional exceptions to the warrant requirement.[1]

*Id.* 99 N.M. at 384, 658 P.2d at 459. The second type of plain view, which we will denominate "open view" to avoid confusion, arises in this case. *Powell* held that once a vehicle has been lawfully stopped on the public highway, no search is involved when officers make observations that any member of the public had a right to make. *Accord Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (prevailing plurality opinion); 1 W. LaFave, *supra,* § 2.5(c), at 449.

We have already upheld the primary inspection, and defendants have not challenged the detention for secondary inspection, at least for the period before Newman had completed the computer check and returned the license and registration doc-

---

**1.** We do not consider whether the distinction between "plain view" and "open view" has become irrelevant with the rejection by the United States Supreme Court of the "inadvertent discovery" requirement for seizure of objects in plain view. *See Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

uments. As we shall discuss in the next section, the detention of defendants' truck after the return of defendants' documents was also lawful. Therefore, according to *Powell,* since the detention of the truck was at all times lawful, there was no search insofar as the officers observed what members of the public had a right to see.

*Powell* specifically upheld the officer's looking through a window of a vehicle. The aspect of Burton's observations not expressly decided by *Powell* is his observation of the exterior of the truck. Defendants' objections are directed particularly at Burton's observations of the underside of the truck. We hold, however, that the underside of defendants' truck was sufficiently exposed to public view that Burton's observations did not constitute a search.

The truck's undercarriage was apparently elevated substantially above the roadway. Burton testified that he could see the entire underside from the vantage point of his own vehicle, which was down a slope from defendants' truck. When he arrived at the truck, he knelt on one knee to look at the underside. Defendants claim that this change in position distinguishes this case from *Powell,* where "[t]he deputy did not crane his neck, lean into the truck or do anything unusual to see the plastic bag." *Id.* 99 N.M. at 383, 658 P.2d at 458. But the discussion of the open-view doctrine in *Powell* made no reference to the officer's posture. We do not see why the open-view doctrine should be dependent on the officer's maintaining an upright, military bearing while making observations. As stated in reference to similar circumstances by the prevailing plurality of the United States Supreme Court (with no dissent expressed on this point):

> [T]he fact that [the officer] "changed [his] position" and "bent down at an angle so [he] could see what was inside" Brown's car * * * is irrelevant to Fourth Amendment analysis. The general public could peer into the interior of Brown's automobile from any number of angles; there is no reason [the officer] should be

precluded from observing as an officer what would be entirely visible to him as a private citizen.

*Texas v. Brown,* 460 U.S. at 740, 103 S.Ct. at 1542.

Nor does Burton's crawling under the truck take his observations out of the open-view doctrine. He was merely observing from a closer distance a portion of the truck's exterior that had been visible from his own vehicle. When Burton crawled under the truck, his view of the truck's underside was conducted, quite literally, from a public highway. The inspection to see if any fuel lines were connected to the rear gas tank did not require Burton to peer into any cranny or crevice. In the circumstances of this case Burton could view the underside of the truck's exterior from as close as he deemed necessary without being subject to the constitutional restrictions on "searches." *See Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (officers scraped paint from a car's exterior and matched the tire tread to the cast of a tire impression from the scene of the crime). *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (officers' moving stereo components in order to find serial numbers constituted search), relied upon by defendants, is distinguishable because Burton did not move any object to view the underside of the truck.

To state our conclusion in other terms, defendants had no constitutionally protected reasonable expectation of privacy with respect to the underside of their truck. The members of the United States Supreme Court appear to be in accord that whether one has such a protected interest depends upon (1) whether the individual has "exhibited an actual (subjective) expectation of privacy," *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), and (2) whether that expectation is "one that society is prepared to recognize as 'reasonable.'" *Id. See California v. Ciraolo,* 476 U.S. 207, 211 (majority opinion) and 219 (dissent), 106 S.Ct. 1809, 1811 and 1816, 90 L.Ed.2d 210 (1986). Neither re-

quirement is met here. First, defendants did not exhibit any subjective expectation of privacy. Nothing suggests that defendants attempted to conceal the underside of the truck or the absence of fuel lines to the spare gas tank. On the contrary, their truck's underside was more exposed than the ordinary vehicle. Defendants took no "precautions to maintain [their] privacy." *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

Second, such an expectation of privacy would not be reasonable. Although casual observation of the underside of a vehicle may not be frequent, that portion of a vehicle is subject to repeated examination by service station personnel and persons retrieving objects that are inadvertently dropped or rolled under a vehicle. That portion of the vehicle may not often be observed, but it is not hidden. Nor is it thought of as a storage site for private items. It is hardly a common practice in our society to secrete objects underneath a vehicle to keep them from public view. Other states have indicated that there is no protected privacy interest in the underside of a motor vehicle. *Cf. Ramer v. State*, 530 So.2d 915, 918 (Fla.1988) (VIN viewed from under car); *People v. Brooks*, 405 Mich. 225, 274 N.W.2d 430 (1979) (same); *Commonwealth v. Grabowski*, 306 Pa.Super. 483, 452 A.2d 827 (1982) (same). We need not decide if that is always the case. Here the underside of defendants' truck was fully visible to Agent Burton while he was standing by his own vehicle. There could be no reasonable expectation of privacy.

## C. Detention of the Vehicle After Completion of the Computer Check

 The record indicates that certain of Burton's actions, such as his crawling under the truck and tapping on the spare gas tank, occurred after Newman completed the computer check and returned defendants' documents. Therefore, if it was unlawful to detain the vehicle after the return of the documents, the state is not entitled to the fruits of those actions. We hold, however, that the detention after Newman returned defendants' documents was con-

stitutionally valid. We consider: (1) the period of time before Burton informed Newman of his observations, and (2) the period of time after Burton's conversation with Newman.

The second period of time can be disposed of briefly. Once Burton informed Newman of his suspicions regarding the rear gas tank and the basis for those suspicions, Newman had reasonable grounds for further detention of the truck. Indeed, he had almost all of the information that we find in the next section of this opinion to constitute probable cause. Although Newman may have thought that the legal justification for the detention was defendants' consent, rather than reasonable suspicion, his subjective legal analysis does not undermine the constitutionality of the detention. *See United States v. Hawkins*, 811 F.2d 210 (3d Cir.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); 1 W. LaFave, *supra*, § 1.4(d).

 The detention during the first period of time can be upheld on two grounds. First, the detention during that time was lawful based solely on what was known to Newman. After Newman received a response to his computer check, he returned to defendants, gave back their documents, and then requested consent to search the vehicle. He testified that a negative computer check does not eliminate the possibility that a vehicle is stolen and, as a matter of routine, he asks permission to search so that he can check for alteration of the vehicle identification number, as well as look for weapons or contraband.

We hold that a momentary extension (a few seconds) of a previously lawful detention for the purpose of requesting permission to search is constitutionally permissible in these circumstances. The additional intrusion is so minimal that we fail to see how fourth amendment interests would be noticeably advanced by requiring officers to request consent before the computer check is completed. There is no reason to believe that the time necessary to make the request was any longer than would have been necessary in any event to inform de-

fendants of the result of the computer check and to advise them that they were free to leave.

Defendants rely on *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), for the proposition that reasonable suspicion is necessary for any detention, even a momentary one. But there is a qualitative distinction between imposing a brief seizure and extending a seizure a brief time, particularly when the sole purpose of the extension of the detention is to request permission to conduct further investigation. Defendants rely on no cases involving a similar factual situation; the cases in point that we have found support the legality of the officers' conduct here.

In *United States v. Diaz–Albertini,* which involved a roadblock conducted by the New Mexico State Police for the same purposes as the one here, the Court wrote: "After the negative [computer check] it was permissible for the officer to ask to search." *Id.* at 659. *Accord United States v. Walraven,* 892 F.2d at 976. *Cf. State v. Cohen,* 103 N.M. 558, 711 P.2d 3 (1985) (request for consent after negative computer check), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986); *State v. Jackson,* 296 Or. 430, 435, 677 P.2d 21, 26 (1984) (In Banc) (officer need not make abrupt about-face after checking documents); *State v. Hewey,* 144 Vt. 10, 471 A.2d 236 (1983).

Moreover, the officer's request for consent was granted. The district court found the consent to search to be voluntary. We see no reason to overturn that finding. Defendants' challenges to the consent are: (1) it encompassed only the truck's interior, not the undercarriage or the spare gas tank, and (2) it was the product of an unlawful detention. Although the factual premise for the first challenge may be correct (the consent may have encompassed only the truck's interior), the search had not extended beyond the admitted boundaries of the consent when Burton had his conversation with Newman. Therefore, the issue of the scope of the consent is irrelevant to the legality of the detention prior to the conversation. Defendants' second challenge is predicated on the rule that even though "a voluntary consent can validate what might otherwise be an illegal search and seizure," *State v. Cohen,* 103 N.M. at 563, 711 P.2d at 8, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent search is exception to requirements of warrant and probable cause), the consent may be ineffective if it is sufficiently tainted by prior unlawful police conduct. *See United States v. Gonzalez,* 763 F.2d 1127 (10th Cir.1985). *Cf. State v. Cohen.* The challenge here fails, however, because we have upheld the legality of the police conduct prior to the consent.

 The second justification for the detention during the first period of time is that Burton's prior observations regarding the gas tank provided him with reasonable suspicion, if not probable cause, to detain the truck for further investigation. Although Newman, the one who instructed defendants to remain, did not possess the information Burton had acquired, Burton's knowledge can validate the detention because of the certainty that, even if Newman had not requested or obtained consent, Burton would not have permitted the truck to depart. *See United States v. Ragsdale,* 470 F.2d 24 (5th Cir.1972); 2 W. LaFave, *supra,* § 3.5(c).

### D. Probable Cause

 Finally, we hold that the officers had probable cause to search the gas tank. Because it was attached to a motor vehicle, the officers did not need a warrant to conduct the search. *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

When the officers conducted the search, they knew that the gas tank was a phony. The district court's findings included the following:

17. Agent Burton's belief that the gas tank on defendants' vehicle was a false one, was based on several factors, including: that the gas tank was located where the spare tire is normally located; that the gas tank protruded below the

truck's bumper and was visible from a distance; that the tank looked new and shiny as opposed to the remainder of the undercarriage of the vehicle, which appeared dirty; that there were no filler connections from which the tank could be filled; that a plank and floor jack, that could reasonably be used to install and remove the false gas tank, were seen in the bed of the vehicle through the vehicles [sic] window; that the defendants gave different answers when asked how many gas tanks the vehicle had.

In addition, Burton, by tapping on the tank, determined that it contained a solid substance, although not uniformly throughout it. Also, the occupants of the truck did not know how it could be used for fuel and became nervous when asked. Burton was familiar with the use of phony gas tanks to conceal contraband. Taken together, this evidence gave the officers probable cause to believe that the tank was being used to conceal contraband.

### 3. CONCLUSION

For the above reasons, we affirm the district court's denial of defendants' motion to suppress and affirm defendants' convictions and sentences.

IT IS SO ORDERED.

APODACA, J., concurs.

MINZNER, J., concurs specially.

MINZNER, Judge, specially concurring.

I concur in the result reached by the majority and in the discussion contained in Sections 1, 2(A), 2(B), and 2(D) of the court's opinion. I agree with the discussion in 2(C) of the period of time during which the vehicle was detained after Border Patrol Agent Burton's conversation with Officer Newman. I write separately as to the discussion in 2(C) of the period of time during which the vehicle was detained before Burton informed Newman of his observations. I write separately because I view defendants' first two appellate arguments as closely related and would prefer to address the issues analyzed in Section 2(C) from a different perspective and because I disagree with the holding that a

"momentary extension (a few seconds) of a previously lawful detention for the purpose of requesting permission to search is constitutionally permissible in these circumstances." 111 N.M. at 46, 801 P.2d at 112. However, to the extent I disagree with the majority opinion, I believe this court is bound by the supreme court's decision in *State v. Cohen*, 103 N.M. 558, 711 P.2d 3 (1985) and that, under the supreme court's decision in *Cohen*, the trial court's decision to deny defendants' motion to suppress should be affirmed. Consequently, I concur in the result reached by the majority in Section 2(C).

### DEFENDANTS' APPELLATE ARGUMENT AS TO SECTION 2(C).

Defendants have made only three arguments: (1) the initial stop constituted an unlawful seizure; (2) the detention was for the sole purpose of searching the vehicle and was unreasonable; and (3) they did not consent to the warrantless searches. Defendants rely primarily on the Tenth Circuit's opinion in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988) to argue that the initial stop was unlawful and that the subsequent detention was unreasonable. Defendants do not challenge their detention prior to the time Officer Newman completed his computer check, other than to contend, generally, that the roadblock did not meet the minimization requirement established in *City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (Ct.App. 1987), and specifically that Officer Newman could not lawfully examine the driver's license of passenger Bolton. The majority views defendant's argument based on *Betancourt* as limited to the stop and analyzes *Betancourt's* minimization requirement as addressed to the conduct of the initial stop and not to the further detention. While I think that is a reasonable interpretation of *Betancourt*, it does not fully answer defendants' argument as to the detention before Burton informed Newman of his observations. I understand defendants' argument as to the further detention as an extension of their argument concerning the stop. Thus, although I agree

with the majority's characterization of defendants' argument as to the roadblock, I believe defendants also have argued that the further detention was improper based on *Guzman* and that *Betancourt* supports that argument.

*Guzman* involved a stop for violation of the New Mexico seat belt requirement. The stop involved an extended detention because the officer making the stop suspected that the defendants were carrying contraband. The trial court found that the officer's actual intent in making the stop was to check for possession of drugs, and, in any event, the detention was prolonged beyond its legitimate scope. The appellate court ruled that the stop had to be judged by an objective rather than a subjective standard, but the appellate court then considered the trial court's alternative holding that the detention was prolonged beyond its legitimate scope. On that issue, the appellate court agreed with the trial court. Reasoning that at a routine traffic stop, the officer making the stop may check license and vehicle registration, run a computer check, and issue a citation, the court appears to limit the length of the detention to the time necessary to accomplish those tasks, unless the officer develops reasonable suspicion of a serious crime during that time.

*Betancourt* relied on a California Court of Appeals decision, *Ingersoll v. Palmer*, 193 Cal.App.3d 617, 221 Cal.Rptr. 659 (1985), which was subsequently affirmed by the California Supreme Court. *See Ingersoll v. Palmer*, 43 Cal.3d 1321, 241 Cal. Rptr. 42, 743 P.2d 1299 (1987). Both California decisions uphold sobriety roadblocks on the theory that they are administrative inspections, not subject to the usual rule that any detention be justified by reasonable suspicion of individual wrongdoing. Thus, *Betancourt's* minimization requirement is an integral part of the limitations imposed on a substitute for a criminal warrant based on probable cause. The same principle—minimization of police intrusion—is applicable to the detention during secondary inspection at a roadblock.

The other members of the panel agree that the detention during secondary inspection at a roadblock must be based on reasonable suspicion. As the majority opinion notes, Officer Newman "requested consent only after the vehicle had been removed to secondary. Such removal requires reasonable suspicion or probable cause." 111 N.M. at 37, 801 P.2d at 107. However, the majority concludes that, notwithstanding the requirement of reasonable suspicion or probable cause to support a secondary inspection, "a momentary extension (a few seconds) of a previously lawful detention for the purpose of requesting permission to search is constitutionally permissible in these circumstances." 111 N.M. at 42, 801 P.2d at 112. I respectfully disagree. I believe that holding is inconsistent with the principle that detention during secondary inspection at a roadblock must be based on reasonable suspicion.

THE MOMENTARY EXTENSION OF THE DETENTION AT SECONDARY INSPECTION.

To permit an extended detention in the context of a roadblock to check licenses and registration is to make such a roadblock attractive for drug enforcement purposes. *Guzman* discusses the "pretextual use of police power," *id.* at 1517, and also states that where police discretion to stop virtually everyone creates the potential for abuse, the United States Supreme Court has held the practice unconstitutional "without specific inquiry into whether the police actually abused discretion." *Id.* at 1518. I think it is arguable that *Guzman* limited the scope of the detention after a traffic stop to the tasks associated with the traffic stop in order to prevent routine traffic stops from becoming excuses for investigation of more serious crimes. As I read *Guzman*, it limits the scope of the detention to the length of time it takes to dispel reasonable suspicion. I would do the same for the detention during secondary inspection at a roadblock.

In the present case, the roadblock is a substitute for a warrant based on probable cause, and thus the scope of the permitted intrusion at and during a secondary inspec-

tion should be reasonable suspicion. Here, reasonable suspicion apparently arose as a result of the discrepancy between registration information and the actual occupancy of the vehicle. I note that there may often be a discrepancy between registration information and the actual occupancy of a vehicle. Family members or others sharing a residence may share cars not always registered in the name of each resident; friends loan cars to each other in case of emergency; and out-of-town visitors use the car of a host or hostess. Since reasonable suspicion sufficient for the secondary inspection to which the opinion refers can arise when license and registration do not match, *see United States v. Lopez*, 777 F.2d 543 (10th Cir.1985), I think it is important to limit the detention at a secondary inspection to the time necessary to dispel the suspicion that gave rise to the need for the secondary inspection. *See United States v. Guzman; cf. City of Las Cruces v. Betancourt.*

The majority appears to accept that proposition as a general rule. However, they reject the result for which defendants have argued on the grounds that the request for consent was constitutionally permissible under the circumstances of this case.

The Tenth Circuit cases cited in Section 2(C) of the court's decision indicate that it is lawful for officers to ask for consent to search in the course of a detention supported by reasonable suspicion. *See, e.g., United States v. Walraven*, 892 F.2d 972 (10th Cir.1989). They also indicate that reasonable suspicion is not necessarily eliminated after a negative computer report. *See, e.g., United States v. Diaz–Albertini*, 772 F.2d 654 (10th Cir.1985). However, after a negative computer report, I am not clear why an officer would have reason to believe a car has been stolen. Thus, I am not persuaded it is always appropriate to check the vehicle's identification number to see if it has been altered and therefore do not believe it is possible to say that the entire detention in this case was supported by reasonable suspicion. To the extent that the cases cited by the majority are to the contrary, I believe they are wrongly decided.

The majority suggests that the momentary extension of a detention for purposes of requesting consent is, in any event, minimally intrusive. With respect, I suggest that is not the issue. *See United States v. Guzman.* Rather, under *Guzman*, I believe the issue is whether the entire detention is supported by reasonable suspicion. In any event, the request of consent in this case seems to me to be more than minimally intrusive. *Cf. United States v. Lewis*, 728 F.Supp. 784 (D.D.C.1990) (concerted planned police program that involves indiscriminate stopping, questioning, and searching of individuals traveling by bus, sometimes coupled with a request to search luggage, in order to obtain incriminating information, violates fifth amendment right to due process).

## THE SUPREME COURT'S DECISION IN COHEN.

Perhaps the majority is reluctant to rely on the supreme court's decision in *Cohen.* Their reluctance may stem from an unwillingness to extend its holding. I share that reluctance and appreciate the thoughtfulness with which the other members of the panel have searched for an alternative ground. However, I prefer to rely on *Cohen*, which may yet be overruled, than to adopt a rationale based on cases that seem to me inconsistent with the principle that detention at secondary inspection should be based on reasonable suspicion.

In any event, I believe the supreme court's ruling in *Cohen* is controlling. Perhaps the other members of the panel do not view the supreme court's decision in *Cohen* in the same way. I wish I could agree. *But see State v. Pena*, Ct.App. No. 10,298 (Filed October 27, 1988), *overruled on other grounds*, 108 N.M. 760, 779 P.2d 538 (1989).

In *Cohen*, the trial court had found that, although defendants had consented to a search of their vehicle and that their consent was voluntary, the consent was tainted by an illegal detention. This court affirmed the trial court, Judge Donnelly dissenting, and noted that to the extent *State*

*v. Ruud,* 90 N.M. 647, 567 P.2d 496 (Ct. App.1977), could be read to say that a voluntary consent validated a consent tainted by an illegal detention, it was not to be followed. The supreme court reversed this court and held (a) that the detention was not illegal, and (b) in addition, New Mexico follows the rule that a voluntary consent can validate what might otherwise be an illegal search and seizure, citing *Ruud.* I view the additional holding as controlling this case.

Under *Cohen,* then, I believe the detention that occurred prior to Burton's conversation with Newman was validated by Gill's consent to the search of the cab. I concur in the majority's analysis of the period of time after Burton's conversation with Newman and that "[o]nce Burton informed Newman of his suspicions concerning the rear gas tank and the basis for those suspicions, Newman had reasonable grounds for further detention of the truck." 111 N.M. at 42, 801 P.2d at 112. Since Burton's observations prior to the end of the search of the cab provided probable cause for a further search, I would not discuss the question of whether Gill consented to more than a search of the cab, nor the question of whether Burton's knowledge can validate the detention during the period of time before Burton informed Newman of his observations on the alternative ground that "even if Newman had not requested or obtained consent, Burton would not have permitted the truck to depart." 111 N.M. at 43, 801 P.2d at 113. On this basis, I concur specially.