861 P.2d 978
**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Bernard MONTOYA, Defendant–
Appellant.**

**No. 13855.**

Court of Appeals of New Mexico.

Aug. 6, 1993.

Certiorari Denied Oct. 13, 1993.

Tom Udall, Atty. Gen., Max Shepherd, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Michael E. Vigil, Marchiondo & Vigil, P.A., Albuquerque, for defendant-appellant.

## OPINION

PICKARD, Judge.

Defendant appeals his convictions of six counts of fourth degree felony fraud over $250, eleven counts of third degree felony fraud over $2500, one count of fourth degree felony destruction of documents, and two counts of second degree felony racketeering. Defendant, the former manager of the Guadalupe Credit Union (GCU), was convicted based on his participation in a scheme which defrauded GCU's members by making inflated car loans to members who had recently been turned down for other loans and accepting the excess cash from such inflated loans.

Defendant raises five issues on appeal: (1) whether the trial court erred in denying his motion to suppress evidence because the warrantless search was impermissible, (2) whether the trial court erred in denying his motion for a continuance and his motion for a new trial based on a discovery violation, (3) whether the trial court erred in submitting fraud over $250 as a lesser included offense of fraud over $2500, (4) whether Defendant was sentenced in violation of his double jeopardy rights, and (5) whether it was error to require Defendant to make restitution as a condition of release pending appeal. We affirm the trial court on issues one, two, three, and the unit of prosecution part of issue four. We reverse the double description part of issue four and remand for resentencing, and we also reverse the trial court on issue five.

## SEARCH

GCU is regulated by the state Financial Institutions Division (FID) under the Credit Union Regulatory Act, NMSA 1978, §§ 58-11-1 to -65 (Repl.Pamp.1991). In addition, since credit union deposits are insured by the federal government, GCU is also regulated by the National Credit Union Administration (NCUA) under 12 U.S.C. Section 1751 (1988). In January 1991, FID sent a supervisory examiner, Robert Mannel, to conduct a regular examination of GCU. The last independent audit of GCU indicated that several loans had been inappropriately approved, and Mannel was not satisfied with Defendant's explanations. Mannel extended the scope of the examination because of these improprieties and called in a NCUA examiner to assist him. The FID/NCUA joint-examination lasted four weeks. Based on the results of Mannel's examination, the director of FID, Ken Carson, decided to impose a conservatorship on GCU. Prior to the imposition of the conservatorship, Carson met with Fred Smith, Director of Prosecutions for the Attorney General, to discuss the conservatorship and possible criminal activity.

The conservatorship was imposed on March 13, 1991, at which time Defendant was served with the conservatorship order. The conservatorship order appointed Carson as conservator and entitled him "to immediately take possession and control of the business and assets of the Credit Union to preserve the assets ... and to protect the interests of the members of the Credit Union." In addition, the terms of the order required that GCU's board of directors, officers, employees, and agents "immediately turn over all books, records, accounts, documents, assets and property, both real and personal, of every description of the Credit Union to the Director and his authorized representatives." The imposition of the conservatorship (the takeover) involved the joint participation of FID, NCUA, and the Attorney General's Office. At least four members of the Attorney General's Office were present, including a financial investigator and two armed special agents. In addition, five members of FID, including Director Carson and Deputy Director Fred Gallegos, and at least three NCUA examiners, including Supervising Examiner Eleanor Taylor, were also present. Assistant Attorney General Smith testified that the Attorney General's agents and armed security personnel accompanied the FID for the purpose of providing security, but not for the purpose of effecting a search and seizure. No criminal referral regarding GCU was made to the Attorney General's Office until April 8, 1991.

During the takeover, Defendant's briefcase and a cardboard box were searched. This search was conducted without an ad-

ministrative or criminal search warrant. Among the items searched and confiscated was a manila envelope (the checkerboard evidence), which is the evidence Defendant contends should be suppressed. The checkerboard exhibit is a 9½ × 11–inch manila envelope that has a hand-drawn grid on the outside of the envelope. The grid itself is filled in with information relating to a number of illegal GCU loans. The inside of the envelope contains lists of the illegal loans, GCU receipts, and security agreements clearly marked "Guadalupe Credit Union."

Certain facts pertaining to this search are disputed by the parties. Defendant contends that NCUA Examiner Taylor told him to collect his personal belongings and leave; that Taylor demanded to search Defendant's closed briefcase, into which he had not put any papers or folders from his desk; and that FID Deputy Director Gallegos was not in Defendant's office during the search. In addition, Defendant contends that Gallegos testified that the checkerboard envelope was found in Defendant's briefcase.

Gallegos testified that Defendant had an open briefcase into which Defendant put items from his office and that Gallegos gave Defendant a computer-paper box into which Defendant also put materials. Gallegos testified that he asked to search both the open box and the open briefcase and then conducted a cursory review of both containers. A review of the transcript shows that Gallegos specifically testified at two separate intervals that the checkerboard evidence was retrieved from the box, not the briefcase. No contrary reference by Gallegos is apparent at the portion of the record referred to by Defendant. Gallegos further testified that his reason for extracting the manila envelope from Defendant's personal belongings was that Gallegos suspected that the manila envelope related to GCU business, due to the obvious appearance of the checkerboard grid. The details that Gallegos observed on the outside of the envelope and which triggered his suspicions were the list of names other than Montoya's or Montoya's wife's and various account numbers, payment dates, and payment amounts. In addition, Taylor testified that she neither searched Defendant, nor did she observe him being searched, nor did she order him to be searched.

■ Defendant contends that the warrantless search was impermissible under both the United States Constitution and the New Mexico Constitution. However, Defendant failed to discuss or argue that any different protection is offered to the case at hand by the New Mexico Constitution. As set forth in *State v. Sutton*, 112 N.M. 449, 454, 816 P.2d 518, 523 (Ct.App.), *cert. denied*, 112 N.M. 308, 815 P.2d 161 (1991), "References to the state constitution, without some discussion or argument concerning the scope of its protections, are not enough to alert the trial court to the issue of a possible difference between the rights afforded by the state constitution and those provided by the fourth amendment." *See also State v. Casteneda*, 97 N.M. 670, 674, 642 P.2d 1129, 1133 (Ct.App.1982) (objecting party must advise court specifically of the ground of objection so that the court may rule intelligently). Defendant failed to preserve on appeal the issue that the New Mexico Constitution serves as an adequate and independent ground for reversal. *See Sutton*, 112 N.M. at 454, 816 P.2d at 523. Accordingly, we will review this issue under the Fourth Amendment.

In arguing that the warrantless search was impermissible and that the checkerboard evidence should be suppressed, Defendant first asserts that the search failed to satisfy the administrative inspection exception to the warrant requirement as set forth in *State ex rel. Environmental Improvement Agency v. Albuquerque Publishing Co.*, 91 N.M. 125, 571 P.2d 117 (1977), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1590, 55 L.Ed.2d 808 (1978). Second, Defendant asserts that the warrantless administrative inspection was a mere pretext to conduct a search for evidence of criminal activity and to avoid the necessity of probable cause and a warrant. *See United States v. Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d 200, 204 (3d Cir.1980) (search was pretext in which the purpose of

the search was unrelated to regulatory purpose).

■ A warrantless search is per se unreasonable unless the government can demonstrate that the search comes under an exception to the warrant requirement. *State v. Munoz,* 111 N.M. 118, 119, 802 P.2d 23, 24 (Ct.App.), *cert. denied,* 111 N.M. 136, 802 P.2d 645 (1990). However, if certain criteria are met, closely regulated industries with a history of pervasive government regulation may be inspected without a warrant. *New York v. Burger,* 482 U.S. 691, 702–03, 107 S.Ct. 2636, 2643–45, 96 L.Ed.2d 601 (1987). There is no dispute that GCU is pervasively regulated on both the state and federal levels. *See* §§ 58–11–1 to –65; 12 U.S.C. § 1751. Although the warrantless search in this case was not part of a regular inspection program, the rationale of *Burger* supports the search here in the context in which it was made, i.e., as part of a seizure of business records when the business was being taken over pursuant to statutory authority. *See United States v. Gordon,* 655 F.2d 478, 482–83 (2d Cir.1981); *id.* at 486–87 (Oakes, J., concurring).

The applicable Fourth Amendment test for a warrantless administrative search of commercial premises in the context of a pervasively regulated business was discussed in *Burger,* 482 U.S. at 702–03, 107 S.Ct. at 2643–45:

This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." ...

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. (Citations omitted.)

We apply these principles to the seizure of the GCU pursuant to Section 58–11–3(L). Regarding the first prong of the *Burger* test, the government has a substantial interest in supervising and regulating credit unions such as GCU to ensure that the accounts, assets, investments, and loans are soundly and legally managed. *See* §§ 58–11–3 & –5. The government also has a substantial interest in ensuring that a credit union functions to create "a source of credit at fair and reasonable rates of interest and [to provide] an opportunity for its members to use and control their own money on a democratic basis in order to improve their economic and social condition." Section 58–11–2(C).

Regarding the second prong of the *Burger* test, the conservatorship was imposed precisely because of FID's fears that GCU's assets were being managed in an unsafe and unsound manner. Suspicion that the mismanagement was intentional compounded FID's concerns about the need for urgent and immediate intervention. The risk of destruction of GCU materials, which could render tracing the missing business assets impossible, was another concern faced by FID. Therefore, the facts of this case indicate that FID's interest in expeditiously securing GCU documents and materials during the course of the imposition of the conservatorship, in order to prevent additional loss or destruction of credit union resources and records, was necessary to further a substantial government interest. Given the scope and complexity inherent in an investigation of the financial condition of a credit union, the delay required for preparation of an affidavit for a search warrant and proper review of the affidavit by a magistrate could jeopardize effective regulatory action. In light of such extensive delay and the possibility of leaks to credit union personnel, the need for a warrantless search and seizure is

particularly evident here. *See Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *id.* at 612–13 n. 5, 101 S.Ct. at 2545–46 n. 5 (Stewart, J., dissenting).

In applying the final prong of the *Burger* test, we find that this part of the test is also satisfied. Section 58–11–5 clearly puts Defendant, as manager of GCU, on notice that the director of FID is empowered to examine or order the examination of GCU. The scope of such an examination requires that GCU's board members, executive officers, agents, and employees provide FID with "full access to all books, papers, securities, records and other desired sources of information" pursuant to Section 58–11–5(A). We interpret Section 58–11–5 as properly limiting the scope of the examination to credit-union-related materials and limiting the discretion of the inspecting officials to that extent as well. Section 58–11–3 also notifies the credit union that the FID director has the statutory authority, as exercised in the instant case, to appoint himself or herself conservator and "to immediately take possession and control of the business and assets of any credit union in any case in which the director determines that such action is necessary to conserve the assets of the credit union or to protect the interests of the members of that credit union." Section 58–11–3(L)(1). We also interpret Section 58–11–3 as limiting the scope of the conservatorship to possession, control, and conservation of credit-union-related assets and interests.

■ The scope of the warrantless search was also commensurate with the rationale that excepts the search from the warrant requirement. *Cupp v. Murphy*, 412 U.S. 291, 295 & n. 2, 93 S.Ct. 2000, 2003 & n. 2, 36 L.Ed.2d 900 (1973). In the case at hand, the inspection was limited to a detention of Defendant in order to inspect items he sought to take out of GCU. The confiscated items appeared to relate to credit union business, and his removal of such items was in direct violation of the conservatorship order. The terms of the order required Defendant to turn over all credit-union-related materials to FID. FID official Gallegos, who conducted the search, testified that in his presence, Defendant put into an open container an envelope that, by its appearance, related to GCU business.

In arguing for and against suppression, the parties have relied on *Albuquerque Publishing Co.* and *State v. Galio*, 92 N.M. 266, 587 P.2d 44 (Ct.App.), *cert. quashed*, 92 N.M. 260, 586 P.2d 1089 (1978). We believe that our decision is consistent with both cases. In summary, we conclude that the trial court did not err in denying the motion to suppress, based on the State's evidence. Based on that evidence, the trial court was entitled to conclude that the State proceeded after the imposition of a conservatorship based on statutory authority and arising out of valid concerns about mismanagement and the need for swift intervention, and the scope of the search was commensurate with the rationale that excepted it from the warrant requirement. Under these circumstances, Defendant's Fourth Amendment rights were not violated. *See generally Burger*, 482 U.S. at 702–03, 107 S.Ct. at 2645–45 (discussing theory behind exception).

■ Turning next to Defendant's pretext argument, we have held in the past that if there is a valid legal basis for the search or seizure, then the intrusion is not a pretext. *See State v. Mann*, 103 N.M. 660, 663, 712 P.2d 6, 9 (Ct.App.1985), *cert. denied*, 103 N.M. 740, 713 P.2d 556 (1986). Under that standard, we must reject Defendant's pretext argument, because we have determined that there was a valid legal basis for the search and seizure in this case. On the other hand, more recently we have left open the question of whether we should recognize the doctrine that an otherwise lawful search was invalid because the ostensible grounds for the search were mere pretext. *See State v. Bolton*, 111 N.M. 28, 33–35, 801 P.2d 98, 103–05 (Ct.App.), *cert. denied*, 111 N.M. 16, 801 P.2d 86 (1990). This pretext doctrine is generally justified as a means of restricting what would otherwise amount in practice to unbridled police discretion in certain circumstances, such as detentions for traffic offenses. *See id.* at

33, 801 P.2d at 103. That justification would not appear to apply in the circumstances of this case, because the conservator is charged with acquiring all assets and documents relating to the credit union business. In any event, even were we to adopt the pretext doctrine and apply it to this case, we must affirm because the record supports the trial court's finding that there was no pretextual purpose here.

■ The trial court's finding that there was no pretextual purpose was a finding on a factual question decided in the context of a suppression motion. The appropriate standard of review in such cases is whether the law was correctly applied to the facts, viewing them in the manner most favorable to the prevailing party. *State v. Boeglin*, 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983). All reasonable inferences in support of the trial court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded. *Sutton*, 112 N.M. at 452, 816 P.2d at 521; *Boeglin*, 100 N.M. at 132, 666 P.2d at 1279. In the instant case, FID's examination revealed unsound and possibly illegal management of GCU's assets. The conservatorship was imposed to reestablish satisfactory management practices and to safeguard GCU's assets. In addition, the search of Defendant occurred during the imposition of the conservatorship and was limited to items that Defendant was attempting to take from GCU premises. Various witnesses testified that the criminal investigation did not begin until after the takeover. Therefore, there was sufficient evidence for the trial court to have found that there was no pretext. *See State v. Apodaca*, 112 N.M. 302, 304, 814 P.2d 1030, 1032 (Ct.App.), *cert. denied*, 112 N.M. 220, 813 P.2d 1018 (1991). Accordingly, we affirm the trial court's denial of the motion to suppress on the grounds that the search was permissible under the administrative search exception to the warrant requirement.

## DISCOVERY

■ Defendant contends that the trial court erred in denying his motion for a continuance and his motion for a new trial due to the State's failure to disclose the checkerboard evidence until twelve days before jury selection. We decline to address the issue of the continuance because Defendant has failed to preserve this issue for appellate review pursuant to SCRA 1986, 12–216(A) (Repl.1992). The references cited in Defendant's brief in chief do not support the assertion that a motion for a continuance based on the State's failure to disclose the checkerboard evidence was made to the trial judge. The references cited show that Defendant moved for a one-day continuance to reconcile recently disclosed working papers to the checkerboard evidence. In response to this motion, the trial court granted a half-day continuance, and Defendant sought no further relief on the basis of the late disclosure of the checkerboard evidence until his motion for a new trial. There is no duty upon the trial court to order a continuance when none has been requested. *State v. Ewing*, 97 N.M. 484, 486, 641 P.2d 515, 517 (Ct. App.1982).

■ Next, we turn to Defendant's assertion that the trial court erred in denying the motion for a new trial. The remedy for violating a discovery order is within the discretion of the trial court. *State v. Johnson*, 91 N.M. 148, 150, 571 P.2d 415, 417 (Ct.App.1977). It is within the discretion of the trial court to grant a new trial for a violation of a discovery order, but a defendant is not necessarily entitled to such relief. *See* SCRA 1986, 5–505 (Repl.1992); *State v. Deutsch*, 103 N.M. 752, 756, 713 P.2d 1008, 1112 (Ct.App.1985), *cert. denied*, 103 N.M. 740, 713 P.2d 556, *and* 476 U.S. 1183–84, 106 S.Ct. 2918, 91 L.Ed.2d 547 (1986). Defendant is not entitled to a remedy absent a showing of prejudice. *Deutsch*, 103 N.M. at 756, 713 P.2d at 1112. We will not disturb the trial court's ruling absent an abuse of discretion. *State v. Saavedra*, 103 N.M. 282, 284, 705 P.2d 1133, 1135 (1985). An abuse of discretion is an erroneous conclusion and judgment clearly against the logic and effect of the facts and circumstances before the trial court or the reasonable, probable, and actu-

al deductions to be drawn from such facts and circumstances. *State v. Hargrove*, 81 N.M. 145, 147, 464 P.2d 564, 568 (Ct.App. 1970).

■ Defendant failed to meet his burden to show that he had been prejudiced by the nondisclosure. *See State v. Perrin*, 93 N.M. 73, 75, 596 P.2d 516, 518 (1979) (citing *State v. Smith*, 92 N.M. 533, 591 P.2d 664 (1979)). Defendant's assertion that he was prejudiced because he did not have enough time to hire a certified public accountant or another expert to examine and analyze the checkerboard evidence is not persuasive. Since Defendant was the author of the checkerboard evidence, he was fully aware of its significance. Therefore, Defendant was in a better position to explain and analyze the purpose of the checkerboard evidence to his defense counsel than a hired expert would have been. Defendant also contends that the late disclosure forced him to testify when he had a constitutional privilege not to do so. Again, we disagree. The existence of the checkerboard evidence authored by Defendant, not the late disclosure, is what prompted Defendant's choice to testify. Perhaps Defendant is arguing on appeal that he would have had an expert witness, rather than himself, testify regarding the checkerboard evidence but there was insufficient time to obtain an expert because of the late disclosure. Defendant, however, does not indicate in his brief that this claim of prejudice was raised in the district court. Finally, Defendant's appellate counsel's arguments which suggest that the State deliberately withheld the exhibit are refuted by his trial counsel's motion for a new trial, in which trial counsel expressly stated that he was not blaming the prosecutor for the late disclosure. Accordingly, we determine that the trial court did not abuse its discretion in denying Defendant's motion for a new trial.

## LESSER OFFENSE

■ Defendant contends that the trial court erred in its submission to the jury of the lesser and necessarily included offense of fraud over $250 for two criminal counts of fraud over $2500. Defendant relies on *State v. Archuleta*, 108 N.M. 397, 772 P.2d 1320 (Ct.App.), *cert. denied*, 108 N.M. 354, 772 P.2d 884 (1989), and *State v. Edwards*, 97 N.M. 141, 637 P.2d 572 (Ct.App.), *cert. denied*, 97 N.M. 621, 642 P.2d 607 (1981), for the proposition that when a defendant is prejudiced, it is reversible error to have given such an instruction over the defendant's objection. Defendant contends that there was insufficient evidence to support submission to the jury of the two counts of fraud over $2500 and that he was prejudiced by lack of notice that the State would offer a lesser included offense instruction on these counts. He also seems to contend that the trial court erred in submitting these instructions over his objection.

We are not persuaded by Defendant's argument. As a matter of law, we fail to see how Defendant could be prejudiced by the giving of a lesser and necessarily included offense instruction. The parties do not contest that fraud over $250 is a lesser and necessarily included offense of fraud over $2500. *See* NMSA 1978, § 30–16–6 (Cum.Supp.1992). Thus, Defendant was put on notice of the included offense when the State charged Defendant with the greater offense. *Edwards*, 97 N.M. at 146, 637 P.2d at 577. Provided that there is evidence to support such an instruction, a lesser included offense instruction can be given even over a defendant's objection. *Archuleta*, 108 N.M. at 398, 772 P.2d at 1321; *Edwards*, 97 N.M. at 146, 637 P.2d at 577. Defendant does not raise a substantial evidence question regarding evidence to support the lesser included offense. In fact, Defendant concedes that there was enough evidence to support convictions of the lesser offense. Defendant's authorities, which deal with lesser-related offenses that are not necessarily included offenses, are not persuasive. *See, e.g., People v. Geiger*, 35 Cal.3d 510, 199 Cal.Rptr. 45, 674 P.2d 1303 (1984) (en banc); *see also* Russell G. Donaldson, Annotation, *Lesser–Related State Offense Instructions: Modern Status*, 50 A.L.R.4th 1081 (1986). Accordingly, we affirm the trial court's decision to give a lesser included offense instruction over Defendant's objection.

*DOUBLE JEOPARDY*

Defendant contends that the portion of his sentence involving three counts of fraud over $2500 (Counts 4, 7, and 10); three counts of fraud over $250 (Counts 5, 8, and 11); one count of fraud over $2500 (Count 13); and one count of making a false written statement for the purpose of obtaining credit union funds (Count 15) violates the double jeopardy clauses of the New Mexico Constitution and the United States Constitution because the offenses involve the same course of conduct and the legislature did not intend to create separate punishable offenses. *See generally Swafford v. State*, 112 N.M. 3, 810 P.2d 1223 (1991). Defendant presents two distinct double jeopardy issues. First, the paired counts of 4 and 5, 7 and 8, and 10 and 11, contrary to Section 30–16–6, involve the issue of proper unit of prosecution. Counts 4, 7, and 10 involve fraud against GCU, and counts 5, 8, and 11 involve defrauding the individual credit union customers. Second, counts 13 and 15, which involve fraud and false statement to GCU, contrary to Sections 30–16–6 and 58–11–65, present the issue of double description.

Defendant contends that the sentence imposed for paired counts 4 and 5, 7 and 8, and 10 and 11 violated his double jeopardy rights because the fraud against the individual borrowers in counts 4, 7, and 10 involved the same course of conduct and was not separated by sufficient indicia of distinctness from the fraud against GCU in counts 5, 8, and 11. *See Swafford*, 112 N.M. at 8, 810 P.2d at 1228. Specifically, Defendant asserts that it is possible that the jury convicted him twice for the same misrepresentations regarding the value of the vehicles—once for making the representations to the individual borrowers and then a second time for making the same misrepresentations to GCU. Because Defendant does not clearly or precisely articulate why the misrepresentations are the same, and because Defendant fails to clarify and substantiate his argument by citing to the evidentiary record, we decline to address this issue on appeal.

In reviewing a judgment of conviction, an appellate court views the evidence in the light most favorable to the verdict, resolving all conflicts therein, and indulges all reasonable inferences in the light most favorable to the judgment. *State v. Lankford*, 92 N.M. 1, 2, 582 P.2d 378, 379 (1978). Defendant's references to the record in support of his unit-of-prosecution double jeopardy argument are inadequate. The only transcript citation in support of this contention is a single reference to the State's summation in the argument section of the brief in chief. Defendant cites to no evidence regarding this issue, either in the summary of proceedings section or elsewhere in his brief in chief. Although Defendant acknowledges that the State had different theories as to which misrepresentations were involved in the counts of fraud, Defendant fails to provide citations to the evidence, fails to describe the substance of the evidence, and fails to present any evidence that would support the judgment below. In presenting such a deficient statement of the facts and argument of this issue, Defendant has failed to comply with SCRA 1986, 12–213(A) (Repl. 1992). *Cf. Martinez v. Southwest Landfills, Inc.*, 115 N.M. 181, 184, 848 P.2d 1108, 1112 (Ct.App.1993) (reviewing court should be able to rely entirely on the appellant's brief in chief in canvassing all the evidence bearing on a finding or decision in order to determine whether there is substantial evidence to support it; neither the appellee nor the reviewing court should have to supplement the appellant's presentation of the evidence).

We see no reason not to apply *Martinez* to one of several issues raised in a criminal case and, accordingly, decline to address Defendant's unit-of-prosecution issue. *See State v. Sierra*, 90 N.M. 680, 682–83, 568 P.2d 206, 208–09 (Ct.App.) (reviewing court refused to consider the defendant's issue of a requested instruction when the defendant failed to cite to the evidentiary record in support), *cert. denied*, 91 N.M. 4, 569 P.2d 414 (1977); *State v. Reese*, 91 N.M. 76, 79–80, 570 P.2d 614, 617–18 (Ct.App.1977) (when issues on appeal went to evidentiary matters and the brief in chief failed to

adequately cite to the tape transcripts, Court would not consider those issues on appeal); *cf. State v. Hernandez,* 104 N.M. 268, 274, 720 P.2d 303, 309 (Ct.App.) (a contention on appeal is deemed abandoned if the appellant fails to cite authority or explain the claim), *cert. denied,* 104 N.M. 201, 718 P.2d 1349 (1986); *State v. Padilla,* 88 N.M. 160, 162, 538 P.2d 802, 804 (Ct. App.) (Court considered as abandoned the issue of whether trial court erred in denying the defendant's motion to dismiss and vacate because the defendant's argument was less than clear and cited no authority to support the argument), *cert. denied,* 88 N.M. 318, 540 P.2d 248 (1975). We affirm Defendant's convictions on counts 4, 5, 7, 8, 10, and 11.

■ Regarding Defendant's double description argument, the State concedes that conviction on count 13 (fraud over $2500) and count 15 (false written statement for the purpose of obtaining credit union funds) violates Defendant's double jeopardy rights. Although we are not bound by the State's concession on this point, *see State v. Maes,* 100 N.M. 78, 665 P.2d 1169 (Ct.App.1983), we are in agreement with it under the facts of this case. Accordingly, we reverse and remand for dismissal of one of the two convictions and for resentencing consistent with this opinion.

## CONDITION OF RELEASE

■ A condition of Defendant's sentence is that he make restitution. The amount of restitution was set at $12,975. As a condition of being released pending appeal, the trial court ordered Defendant to pay this sum of restitution "to the State of New Mexico, through its Attorney General, for the benefit of the Guadalupe Credit Union, ... in some form readily accessible to liquidation." This money is to be paid to Guadalupe Credit Union in the event that Defendant is unsuccessful on his appeal. In essence, the trial court ordered that Defendant must provide security for payment of restitution in order to be released pending appeal. Defendant was determined by the trial court to be indigent, and Defendant's family members posted the funds necessary to secure his release pending appeal. Defendant contends that there is no legal authorization for this condition of appeal bond, and we agree.

The State asserts that the trial court acted within its discretion in requiring security for restitution as a condition of release. It is the State's contention that requiring security for restitution as a bail condition minimizes the risk of harm to the community. The risk the State alludes to is that as a result of being released on bail, Defendant will lose the motivation necessary to successfully make full restitution unless the bond itself serves as security for restitution. In support of this contention, the State relies solely on *State ex rel. Williams v. Ryan,* 490 N.E.2d 1113 (Ind. 1986). We do not read *Williams* as broadly as the State does. The court in *Williams* took special care to note that the bond posted by the defendant was his personal asset and emphasized this point by saying, "There can be little doubt that requiring the defendant to post his own money rather than the money of a friend might very well be an additional assurance that he will appear for trial." *Id.* at 1113. Thus, *Williams* involved a condition designed to assure the defendant's appearance, which is the purpose of conditions of release. While we distinguish *Williams,* we also note that the *Williams* majority did not acknowledge that the trial court had engaged in the type of sham described by the *Williams* dissent. Therefore, this opinion should not be construed to approve such practice.

■ For a defendant to qualify for release after sentencing, the trial court must make a determination that "the defendant is not likely to flee and does not pose a danger to the safety of any other person or the community if released." SCRA 1986, 5–402(C). The trial court made such a determination in this case. It is within the trial court's discretion to establish the conditions of release, and the trial court may increase the amount of bail on appeal. *Id.* However, the purposes behind setting bail are to assure the appearance of the defendant and to minimize endangering any oth-

er person or the community. SCRA 1986, 5–401(A). In assessing the appropriate level of bail for a defendant upon release after sentencing, the trial court receives guidance from an extensive list of appropriate factors to consider as set forth in SCRA 5–401(B) & –402(C).

The bail statutes and rules clearly articulate the purposes behind granting bail and the factors to be considered in setting bail conditions. We find no authorization for the requirement of security for restitution as a condition of release pending appeal in SCRA 5–401 or –402 or in NMSA 1978, Section 31–3–2 (Cum.Supp.1992). Although requiring defendants to make restitution to their victims is the express legislative intent behind NMSA 1978, Section 31–17–1(A) (Repl.Pamp.1990), there is no authorization for requiring security for restitution as a condition of release pending appeal in that statute either.

 Nor are we persuaded by the State's contention that the condition is valid because Defendant's family agreed to put up the appeal bond and assumed the risk that the reviewing court would uphold the trial court and require restitution. This Court addressed a similar argument in *State v. Dominguez*, 115 N.M. 445, 456–458, 853 P.2d 147, 158–160 (Ct.App.1993) in which a condition of probation that allowed the defendant to choose between making a $500 donation to the Taos Sheriff's Office or paying a $5000 fine was struck down as unauthorized by statute. As in *Dominguez*, the choice between an illegal small donation or a large legal fine is no more a choice that leads to a valid agreement than the choice between a temporary freedom based on an illegal bail condition or a legal incarceration pending appeal.

Accordingly, we reverse the trial court's requirement of security for restitution as a condition of bail pending appeal as lacking statutory authorization. *See State v. Nelson*, 53 Wash.App. 128, 766 P.2d 471, 474, 476 (1988) (absent express authorization in the statute, there was no statutory authorization to sell seized property that was unrelated to the crimes committed and to use the proceeds as partial satisfaction of restitution).

*CONCLUSION*

For the reasons stated above, we affirm all of the convictions except for counts 13 and 15. We reverse the trial court's convictions on both of these counts. The State must select which of these counts is to be dismissed, and the trial court should then resentence accordingly. We also reverse the trial court's requirement of security for restitution as a condition of bail.

IT IS SO ORDERED.

MINZNER, C.J., and HARTZ, J., concur.