1999-NMCA-095

985 P.2d 1222

**In the Matter of JASON L., a Child.**

**No. 19,154.**

Court of Appeals of New Mexico.

May 27, 1999.

Certiorari Granted, No.25,806, July 8, 1999.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, for Appellant.

Phyllis H. Subin, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, for Appellee.

## OPINION

DONNELLY, Judge.

{1} The State appeals from an order granting a motion to suppress a concealed firearm seized by the police from Jason L. (Defendant), a minor, following a stop and frisk of both Defendant and his companion. The central issue presented on appeal is whether the stop and search of Defendant was lawful. For the reasons discussed herein, we reverse.

*FACTS*

{2} During their evening patrol on July 17, 1997, two Roswell, New Mexico, city police officers, Dallas McDaniel and Stanley Jordan, observed two youths walking together on Thirteenth Street at approximately 10:00 p.m. As the patrol car drove past the two individuals, Officer McDaniel noticed that one of the youths, Filemon M., kept looking back repeatedly at the patrol car. What particularly caught the eye of the officers was that Filemon M. repeatedly made motions at the left side of the waistband of his pants as if seemingly "adjusting something or messing with something up underneath his big, heavy coat." Although the evening was warm, the officers noted that Filemon M. was wearing a big, heavy jacket and baggy pants. His jacket was zipped closed. Defendant was also wearing a jacket. Officer Jordan stated that it appeared "peculiar" for individuals to have heavy jackets on in the middle of July. Officer McDaniel also testified that the police had received previous reports of juveniles stealing property about a block and a half away, but no reports of criminal activity that night in that area of town.

{3} The officers passed the youths and then drove back to where the two youths were walking. McDaniel asked what the two were doing. Responding to the officer's inquiry, the two youths said that they were just walking. When the officers approached, Filemon M. moved to a position behind Defendant. According to Officer Jordan, Defendant, however, stood still and appeared willing to talk. During this time, Filemon M. continued to make movements as if adjusting something on the left side of the waistband of his pants. This prompted McDaniel to ask whether the two were carrying any knives or other weapons. Neither of the youths responded to this question. McDaniel repeated the question, and one of the youths replied that they did not have any weapons.

{4} Officer McDaniel, noting that Filemon M. several times had pulled at the left side of the waistband of his pants, stated that this action prompted him to believe that Filemon M. had a gun hidden in the waistband of his pants. McDaniel then asked Filemon M. to unzip his coat so he could see what was under it. The youth was nervous and partially unzipped his coat. McDaniel asked him again to open his jacket. Officer Jordan stated that at this point Filemon M. suddenly reached toward his waistband and that Officer McDaniel grabbed the youth's hand. Officer Jordan testified that he saw a gun protruding from the waistband of Filemon M.'s pants and he yelled out, "gun." Jordan stated that when Filemon M. made a sudden movement toward the waistband of his pants, he then patted down the inside of the left waistband of Filemon M. and found a .22 caliber pistol. Filemon M. then informed the officers that he was carrying a second gun. Officer Jordan handcuffed him and conducted a pat-down which revealed another firearm hidden under the youth's clothing.

{5} At this juncture, Officer McDaniel testified that he became concerned for officer safety from Defendant, who was standing near Filemon M. Accordingly, he conducted a pat-down of Defendant which disclosed that he also had a .22 caliber semi-automatic pistol in the waistband of his pants.

{6} The State charged both youths with unlawful possession of a handgun, contrary to NMSA 1978, § 30–7–2.2 (1994).

*DISCUSSION*

{7} The State argues on appeal that the trial court erred in determining that the officers did not have individualized, articulable, reasonable suspicion to approach Defendant and to conduct a pat-down search. Determination of whether a person "has been seized in violation of the Fourth Amendment is a mixed question of law and fact." *State v. Walters,* 1997–NMCA–013, ¶ 8, 123 N.M. 88, 934 P.2d 282.

{8} When reviewing an appeal from an order suppressing evidence, we examine the facts underlying such motion in the light most favorable to the prevailing party. *See State v. Pallor,* 1996–NMCA–083, ¶ 10, 122 N.M. 232, 923 P.2d 599. However, the ultimate determination of the existence of reasonable suspicion is reviewed de novo. *See State v. Eli L.,* 1997–NMCA–109, ¶ 6, 124 N.M. 205, 947 P.2d 162; *see also State v. Jimmy R.,* 1997–NMCA–107, ¶ 1, 124 N.M. 45, 946 P.2d 648 (stating that appeal challenging denial of motion to suppress police officer's stop and search reviewed de novo). Reasonable suspicion exists if a law enforcement officer has a reasonable and articulable suspicion that the person stopped is or has been involved in illegal activity. *See State v. Cobbs,* 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985).

{9} Investigatory stops of individuals may be authorized under narrowly defined circumstances, absent probable cause for arrest without implicating the Fourth Amendment. To validate this limited intrusion, a peace officer must have a specific and articulable basis in fact for suspecting that criminal activity has occurred or is about to take place, the intrusion must be reasonable when viewed objectively in light of the cir-cumstances, and the scope and character of the intrusion must be reasonably related to its purpose. *See Terry v. Ohio,* 392 U.S. 1, 21–22, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{10} Whether these conditions exist is evaluated under an objective standard taking into consideration the facts and circumstances known to the officer at the time of the intrusion. *See State v. Lyon,* 103 N.M. 305, 307, 706 P.2d 516, 518 (Ct.App.1985). The existence of reasonable suspicion is not susceptible to a bright-line test; instead, it must be judged under the totality of the circumstances and the reasonable inferences which may properly be drawn therefrom. *See Cobbs,* 103 N.M. at 626, 711 P.2d at 903 (under objective standard, the critical inquiry is " '[w]ould the facts available to the officer warrant the officer, as a person of reasonable caution, to believe the action taken was appropriate' " (quoting *State v. Galvan,* 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App. 1977))); *see also United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). An investigative detention, however, may not be based upon "an inchoate and unparticularized suspicion or hunch." *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) (internal quotation marks omitted).

{11} The State argues, among other things, that a showing of reasonable suspicion was not necessary to permit the officers to approach the two youths and ask a few questions. *See Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (citing *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)) (stating *Royer* "plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (a person's liberty is not violated simply because an officer attempts to talk to him, as long as the individual is free to disregard the questions and walk away); *United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982) (communication between

police and citizens involving no coercion or detention are outside scope of Fourth Amendment); *see also Walters,* 1997–NMCA–013, ¶ 18, 123 N.M. 88, 934 P.2d 282 (observing that "police officer may approach an individual, ask questions, and request identification without the encounter becoming a seizure under the Fourth Amendment").

{12}  Defendant contends that the State did not argue at the suppression hearing that the stop of the two youths was based on facts or circumstances other than a *Terry* investigatory stop; thus, it failed to preserve any argument that the initial stop was predicated on other grounds. We need not consider whether the officers approached the two youths on other grounds because we determine that the brief stop of Filemon M., objectively reviewed, satisfied the requirements of *Terry.*

■ {13}  Considering the articulable facts given by the officers, which were supported by personal observations and logical inferences, a reasonable police officer could reasonably conclude that Filemon M. was acting in a suspicious manner and that the two youths who were walking together might be involved in criminal conduct. At the conclusion of the hearing on the motion to suppress, the trial court stated, "I agree that there was a reasonable suspicion to stop the other boy [Filemon M.]." The trial court further noted, "I certainly don't fault the officers for searching [Defendant]. After they found the gun on [Filemon M.], I probably would have done the same thing; [however] in light of the way the courts have held, I'm going to grant the motion to suppress." Although the trial court concluded that there was a reasonable basis to stop Filemon M., the court found there was no reasonable basis for the officers to stop Defendant.

■ {14}  Under the circumstances presented here, we agree with the trial court that the officers had a reasonable basis to make a brief investigatory stop of Filemon M. Once this stop was made, the actions of Filemon M., in seemingly adjusting something under his big, heavy coat and the waistband of his pants, gave rise to circumstances from which an objective police officer could reasonably suspect that Filemon M. was carrying a weapon. After conducting a search of Filemon M. and finding him heavily armed with not one, but two firearms, the officers could reasonably fear that Defendant, standing in close proximity to them, might also be armed with a weapon. Officer McDaniel expressly stated that these circumstances prompted him to search Defendant for officer safety. *See Cobbs,* 103 N.M. at 629–30, 711 P.2d at 906–07 ("Reasonable suspicion of the suspect's being armed and dangerous is the standard by which frisks for weapons are measured."). An "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably, prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. In assessing whether an officer acted reasonably in conducting a pat-down, due weight should be given "to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Id.* The factors recited by the officers, we conclude, viewed objectively, constituted a valid basis for the pat-down search of Defendant.

■ {15}  Merely because an individual is a bystander or is located in the general vicinity of another person who is subjected to an investigatory stop and frisk, however, does not automatically give rise to a basis for frisking others in the area. Wayne R. LaFave, in his treatise *Search and Seizure,* discusses the precise question presented in the instant case, noting that in considering the question of whether an individual's companion may only be subjected to a frisk "when the companion himself could have been legitimately stopped for investigation[, the answer is] [m]ost likely not[.]" 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 263 (3d ed.1996). Professor LaFave states that the rationale for this conclusion is that limiting an officer's right to frisk a companion solely to those instances where the companion could himself be legitimately stopped "would not reach all cases in which the arresting officers would be under a reasonable apprehension." *Id.*

{16} As further noted by Professor La-Fave, the "nature of [an individual's] association with [his companion] will sometimes be such that the grounds to stop [a defendant's companion] will carry over to cover [the defendant] as well." *Id.* § 9.4(f), at 185–86. LaFave also observes that "[e]ven if the companion is not sufficiently suspected so that he could be legitimately seized for investigation, the circumstances may nonetheless indicate that the officer should take appropriate precautions." *Id.* § 9.5(a), at 263. Officer Jordan testified that he was concerned for officer safety when Filemon M. made a sudden reach toward the waistband of his pants. Here, the officers could reasonably conclude that Defendant also posed a possible threat. Officer McDaniel stated that for the purpose of the officers' safety, he patted down Defendant for weapons. *See United States v. Berryhill*, 445 F.2d 1189, 1192–93 (9th Cir.1971) (upholding legality of pat-down search for weapons on companion of individual lawfully arrested, where companion is potentially a threat to officer safety); *Lewis v. United States*, 399 A.2d 559, 561 (D.C.1979) ("The fact that his companion had just been arrested for unlawful possession of a firearm is a particularly compelling justification for the frisk of appellant."); *see also People v. Myers*, 246 Ill.App.3d 542, 186 Ill.Dec. 443, 616 N.E.2d 633, 636 (1993) ("While a police officer may not search a person merely because he is with someone who has been arrested, the officer may conduct a pat-down of the arrested person's companions to protect himself or others.").

{17} Here, unlike the situation in *State v. Jones*, 114 N.M. 147, 150, 835 P.2d 863, 866 (Ct.App.1992), where evidence indicated that the police stopped two individuals, one of whom was a known gang member and a reputed distributor of narcotics, without reasonable suspicion and for the purpose of merely performing a stop and frisk, in the instant case, the police had reasonable suspicion to make the stop of Filemon M. when he caught the attention of the officers because, among other things, he kept reaching under the left side of his coat as if he was adjusting something he was carrying under it.

{18} Considering the fact that the two youths were walking together after dark, that they were a few blocks from a place where there had been previous reports of juveniles stealing property, that the two youths were wearing large coats zipped up despite it being mid-July, that the two youths perceptibly changed their pace when they observed the patrol car and one kept looking back over his shoulder, and that Defendant's companion repeatedly made movements under his heavy coat as if adjusting something in the waistband of his pants, these facts could reasonably lead the officers to suspect that Defendant's companion was carrying something which was concealed under his coat. Objectively viewed based on the totality of the circumstances, these facts provided a factual basis whereby the officers could reasonably stop Filemon M. When Filemon M. again made hand movements and reached under his coat while talking to the officers, this provided a reasonable basis to search Filemon M. After a frisk of Filemon M. revealed that he was carrying two guns, that the results of this pat-down indicated the youths had been untruthful about whether they had any weapons, and that Defendant was standing near Filemon M., who was found to be heavily armed, it was objectively reasonable for the officers to conduct a pat-down of Defendant for the purposes of the safety of the officers. Thus, we conclude that it was error to suppress evidence of the weapon found on Defendant.

*CONCLUSION*

{19} For the foregoing reasons, the order suppressing the items found on Defendant is reversed and the cause is remanded for further proceedings consistent herewith.

{20} IT IS SO ORDERED.

ALARID, J., concurs.

APODACA, Judge (dissenting).

{21} I respectfully dissent. I would hold that, under controlling case law, the officers lacked the required reasonable and individualized suspicion to search Defendant under the particular facts in this appeal.

{22} Under our standard of review, we must view the facts in the "manner most favorable to the prevailing party." *State v. Montoya*, 116 N.M. 297, 304, 861 P.2d 978, 985 (Ct.App.1993). "All reasonable inferences in support of the trial court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." In this regard, the majority states that Officer McDaniel testified that, once having found the weapon on Defendant's companion, he "became concerned" for officer safety from Defendant. This statement implies that the officer was concerned or even feared that Defendant too might have a weapon. I would not infer concern or fear from that testimony. For that reason, I would not rely on it to hold there was a legitimate basis for the search. I suggest that the trial court, based on its ruling, did not rely on that testimony either. On appeal, under *Montoya*, we must view the evidence in the light "most favorable to the prevailing party," which in this appeal is Defendant.

{23} In *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994), our Supreme Court held that "[u]nder *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, police officers may stop a person for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that particular person is engaged in criminal activity." (Internal quotation marks omitted.) An officer's knowledge must support "reasonable *individualized* suspicion that the [defendant] had committed or was about to commit a crime." *State v. Eli L.*, 1997–NMCA–109, ¶ 11, 124 N.M. 205, 947 P.2d 162 (emphasis added). The reasonable suspicion, however, must be based on "specific articulable facts, and rational inferences taken from those facts." *Id.* ¶ 8. I submit that the majority's reasoning, in justifying the search of Defendant under the "frisk-of-companion rule" discussed by Wayne R. LaFave in his treatise, *Search and Seizure* §§ 9.4(f), 9.5(a), does not meet the requirements of *Eli L.* Generalized suspicion that a defendant's associates have committed a crime does not suffice. *See id.* In fact, the majority's analysis of the frisk-of-companion

rule does not include all of the factors discussed by LaFave. In assessing the apparent danger of a companion, LaFave considers (1) "the nature of the crime," (2) "the nature of the association between the companion and the arrestee," (3) "the time and place of the arrest," (4) "the number of officers ... present," (5) "whether the companion has a 'suspicious bulge' in his clothing or has made any menacing movements," (6) whether the companion and arrestee were in a car or in premises, and (7) whether the companion "intruded himself into the arrest situation." LaFave, *supra* § 9.5 at 263–64. In my view, under the facts of this appeal, no reasonable and objective basis for individualized suspicion existed.

{24} First, the officers did not observe Defendant engaged in any criminal activity. Mere presence in the area where criminal activity is taking place without more is not sufficient to justify the arrest or detention of an individual. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *State v. Graves*, 119 N.M. 89, 92, 888 P.2d 971, 974 (Ct.App.1994). Second, the officers were required to have more than a bare suspicion that Defendant had some criminal connection with his companion on the night in question. *See Graves*, 119 N.M. at 94, 888 P.2d at 976. Simply walking along with the companion is not enough. The majority observes that, as Defendant and his companion were walking, it was the companion who kept looking back repeatedly at the patrol car, not Defendant. Additionally, what caught the eye of the officers was the repeated motions of Defendant's companion as if "adjusting something ... underneath his big, heavy coat." I submit that any "hunch" or assumption that Defendant was engaged in criminal activity, under these circumstances, without articulable facts focused on Defendant to support that assumption, is insufficient.

{25} Other facts in this appeal support the trial court's suppression order. The officers, for example, were not looking out for particular suspects. As already noted by the majority, the officers had not received reports on the night in question regarding juvenile problems in the area. *Cf. State v. Jimmy R.*, 1997–NMCA–107, ¶ 3, 124 N.M. 45, 946 P.2d 648 (holding that officer had

reasonable suspicion that defendant might have a gun based on concerned citizen's report). There was no indication that the two youngsters were gang members. The area was not a particularly dangerous part of town. Defendant's association with his companion did not warrant reasonable suspicion of Defendant. *See Eli L.,* 1997–NMCA–109, ¶ 11, 124 N.M. 205, 947 P.2d 162 (holding that officers did not have reasonable suspicion of defendant where "they had only generalized suspicion that other gang members, not the [defendant] specifically, had committed a crime or had engaged in any wrongdoing"). The majority relies on the fact that Defendant was wearing a big, baggy coat in the middle of July, but this dress does not provide reasonable suspicion. *See Jones,* 114 N.M. at 149, 151, 835 P.2d at 865, 867 (holding that gang attire is not an articulable fact that "would set defendant apart from an innocent gang pedestrian in the same area").

{26} These facts distinguish this case from *Berryhill,* 445 F.2d at 1192–93, *Lewis,* 399 A.2d at 560–61, and *Myers,* 186 Ill.Dec. 443, 616 N.E.2d at 636, the majority's supporting cases. In *Berryhill,* 445 F.2d at 1192, there was a warrant for the defendant's arrest. Additionally, the arresting officers knew of the defendant's prior arrest history and that he usually had weapons near him. Here, the officers had no such information regarding Defendant.

{27} The court in *Lewis,* 399 A.2d at 561, considered the following factors in evaluating the reasonableness of the officers' stop:

(1) the particular activity of the person stopped for questioning [that] the investigating officer has observed, (2) the officer's knowledge about (a) the activity of the person observed and/or (b) the area in which the activity is taking place, and (3) the immediate reaction or response of the person upon being approached and questioned by the officer.

Under this analysis, the *Lewis* court noted that the officers observed the defendant's companion carrying a concealed weapon in a high-crime area. Additionally, the defendant appeared nervous. Those facts did not exist here.

{28} Similarly, the officers in *Myers,* 186 Ill.Dec. 443, 616 N.E.2d at 636, went to the crime scene in response to a report of a burglary of a truck. An officer recognized the defendant's companion and knew that the companion had prior arrests for weapons violations. Another officer observed the defendant reach into his pocket and drop something onto the truck. Similar circumstances were not present in this appeal.

{29} I am not discounting the importance of officer safety. Although the majority's opinion, in my view, relies heavily on the safety concerns it claims the officers had, it is important to note that the State, in its briefs, mentions "officer safety" only summarily and in passing. The main thrust of the State's argument on appeal was that the officers had reasonable suspicion to search Defendant. Not only did the State argue officer safety only briefly as a basis for reversal on appeal, and apparently did not rely heavily on that point in the trial court, but the State has not recited supporting facts in its argument. Yet, the majority appears to rely heavily on "officer safety," not to affirm the trial court, but to reverse it. My review of the testimony does not reveal that Officer McDaniel displayed any concern or fear as a result of Defendant's presence at the scene. Instead, he merely testified that he essentially was prompted to search Defendant "for officer safety ." The trial court would be free to infer from that fact that the officer routinely decided to pat down Defendant solely as a precautionary measure.

{30} In my view, individualized reasonable suspicion was necessary before Defendant was searched as a companion, and the majority's general impressions that the officers were concerned about their safety is not supported by any of the evidence, as viewed in the light most favorable to Defendant, which we are required to do. I do not believe a court should apply the concept of officer safety abstractly just because, in general, it is a potential concern. We should follow New Mexico's case law that requires reasonable individualized suspicion in an effort to balance the State's interest in security with a person's right to be free from unreasonable searches and seizures. *See* U.S.

Const. amend. IV. I do not believe the majority's opinion does that.

{31} This appeal is yet another example in which this Court is called upon to evaluate the conduct of police officers before we evaluate the conduct of the accused. *See State v. Tywayne H.*, 1997–NMCA–015, ¶ 27, 123 N.M. 42, 933 P.2d 251 (" 'In a government of laws, existence of the government will be imperilled if it fails to observe the laws scrupulously.' " (quoting *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled in part on other grounds by Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967))). Addressing that question is made even more difficult by the legitimate concerns of our citizens that weapons and their use among our youth is becoming a pervasive and alarming dilemma that must be challenged. In addressing the public's concerns, courts must do their job without disregarding an individual's constitutional rights. Because I would conclude that the search of Defendant was not justified, I dissent from the majority's opinion.